The District Court erred in failing to grant a downward adjustment for minor role. There's no factual dispute about that, so the standard of review is de novo, since there are no factual disputes. So the only dispute is about how to interpret 3E1.1A and 3E1.1B. We concede that the extra point is not available to Mr. Ortiz. The argument at trial was completely about the wrong guy on the fence, and it's clear from the transcripts that he wasn't the guy on the fence. He's not a defense to the elements and the government. What are the elements is that it's you. Yes, and he didn't deny that he is the guy found 30 yards north of the border fence. But he also didn't concede the essential elements of the crime until after he was convicted. He declined to enter a conditional plea or consent to trial stipulated facts. He wanted a full trial, and throughout the trial he claimed the government got the wrong guy. How can he be eligible for the downward adjustments you're talking about? Well, the government's being, this is one part, although my friend across the aisle's brief is excellent. I definitely take issue with them saying that, well, they don't say that we argued against an element. They say we suggest. I really don't understand that. If his position was I wasn't the guy who came over the fence, why isn't that defending against the, where the crime was entry, it wasn't found in, why isn't that defending the case? Because as 1ER23 and 2ER11 show, the parties, the court and the parties talked about this issue. And a found in is not a defense to an attempted entry. He was found in the United States 30 yards north of the border. So we conceded, and we talked to Judge Benitez about this, and he said thank you for conceding. I appreciate that. That if he's found in the United States, it's no defense to say, hey, he wasn't the guy on the fence. The only way that that's relevant is to the Fourth Amendment issue as to whether Agent Sigueroa had reasonable suspicion to think he was the guy. Were you referring that issue to the jury? That, this is a weird case because the, it wasn't until about a week before trial, or a couple weeks before trial, that I got a memo from the U.S. Attorney. You didn't go to trial anyway. So how was the trial going to do that? Well, we didn't know that there was, we all assumed that Agent Sigueroa saw Mr. Ortiz on the fence and then stopped him. But the U.S. Attorney interviewed the agent before trial and then sent me a letter saying that's not what happened. He saw someone wearing dark clothing, and he doesn't know if it was Mr. Ortiz or not. So we then had the unusual situation of doing this right before trial. We did an evidentiary hearing about. . . And you lost, and then what? And lost, but it wasn't the best evidentiary hearing. And so going to trial, both parties agreed. Because there wasn't good facts for the defense, or are you complaining about a due process violation? I hadn't yet gone out to the scene and done an investigation, had an investigator look at what the agent was talking about, where people were, the lighting conditions and that. But the only way to cross the border at that point, if you don't go through the port of entry, is to climb the fence. There's no other way to, I suppose you could tunnel under it, but there's no other way to explain why your client was within 35 yards of the fence line if he hadn't crossed it in some fashion. Right, and there was another agent there interviewing four people after Agent Siguroa called and said, I saw someone wearing dark clothing going over the fence. And he's wearing dark clothing. He is, but we don't know what the other people were wearing. There are a number of people, there's taxi stands there, tons of legal. . . But the only way to get to where he was is over the fence. No, this is the. . . If he didn't go through the port of entry. Well, this is the town or the city of Calexico. Mr. Hermanson, this is the fence line right here, right? Right. That's it, okay? It runs all the way past the port of entry, which is right here. Correct, Your Honor. And he's found here. . . Right, and below. . . Which is only, what, a block, a very short block to the north of the international fence line. Correct, and just below where Your Honor pointed is the bathroom that everyone uses. That's open 24 hours. It's the only bathroom. That's just saying he could have been a legal guy who was there for five years and happened to be walking over there at 1.20 in the morning using the bathroom. Sure, or he could have just crossed, or he could have just crossed through the port of entry, or he could have been working there, or he could have been picking someone up. There was no evidence that he came through the port of entry, was there? No. I'm interested in the fact that you've started with the downward adjustment issue. Are you conceding the other points about the reasonable suspicion and so on? No, Your Honor, I can move on. I can move on to my Fourth Amendment arguments. I just thought, Sid, this one was easier. Do you think your strongest case is the downward adjustment? I think it's a slam dunk. I agree with you, but. . . Yeah, I think it's a slam dunk just because this is what Judge Bonita said. I don't believe there was a constitutional issue. There is, the Fourth Amendment. And, no, I don't believe that he accepted responsibility at an early stage. Okay, what's the constitutional issue here? The Fourth Amendment issue. Okay, what's the Fourth Amendment issue? Is it questioning? That's a garden variety. Every policeman has an opportunity, if it wants to, to question any citizen, ask them his name or her name. What's the matter with that? The government argues this is a consensual encounter. It wasn't, and we rely on. . . It doesn't have to be consensual. Any policeman under the Constitution can ask any one of us in this courtroom, if we're out there, excuse me, sir, would you tell me your name? There's no problem with that. Is there under the case law? No, Your Honor, but the issue here is the stop. But you could say, I'm sorry, I don't want to tell you. Oh, yeah, well, he could say that. And he did try to walk away, and this is the other point. . . I only have two points of contention with the government's well-written brief, and this one is the government argues that he had reasonable suspicion to stop him because he couldn't articulate where he was born. No problem. That doesn't produce any identification. Well, that's using the fruit of the stop to justify the stop. So he goes up to him. . . Well, but doesn't Hibble address the situation? The Supreme Court's decision where the deputy was dispatched to the vicinity of some sort of unknown trouble, and the first thing he did was to ask the defendant who was sitting in his truck, you know, produce some identification, and the Supreme Court said that's not a Fourth Amendment violation. Well, here, as in . . . Ask him for his name and identity papers. Here there was a lot more show of force. This case is very . . . Show of force? Yes. One agent who's standing there with a holstered weapon, what's the show of force? The fact that he's there in uniform with a bat? Just like in the United States v. Faulkner, Your Honor, he was in a uniform. He was armed with a firearm. He had come up in his Border Patrol SUV. The problem I had with your discussion, assuming that there was a stop subject to the Fourth Amendment, is that you kept saying there were only three facts, but there was a fourth fact. And the fourth fact was that they had seen the person who came over the fence go off in another direction, a certain direction, and my understanding is the guy in the car in two minutes got to the place where he expected that person to be, and there he was. Is that not accurate? There were other people in the area as well. Well, in the area, but not right at that spot, but even so, so maybe there were four people as to whom he had reasonable suspicion. May I reserve the remainder of my time? Thank you. Good morning. Kyle Hoffman for the United States. I'll begin where Mr. Hermison began, and that's on the acceptance issue. I think it's right to say that the defense did make an argument, I mean, they did specifically ask, both in opening and in closing, return a verdict of not guilty because they got the wrong guy. I think it does make a difference that it's an attempted entry case as opposed to a found-in case because the government has to prove that this particular person had a conscious desire to enter and took a substantial step. So those things are in the mix, and the wrong guy argument – I thought that there was a colloquy in which there was an agreement that it wasn't a defense to say that he was – it's undoubtedly the case that there was that colloquy, but it's also undoubtedly the case that there was a specific, twice in opening and closing, return not guilty verdict because they got the wrong guy. Now, I'd like to step away from that aspect of things and say even apart from that, there wasn't enough for this defendant, Mr. Ortiz, to be awarded acceptance of responsibility. The court was on firm ground even apart from that. Why? Unlike Ochiai-Katan, the district court clearly recognized that just because a defendant is going to trial does not mean that he's forbidden from getting acceptance of responsibility, so recognize that legal point. Second, recognize that after trial, what the defendant has to do is show something, primarily pretrial conduct, that shows acceptance of responsibility. But there are a group of cases in which the trial itself is essentially pro forma for some constitutional defense or something like that and in which acceptance of responsibility would be available. I don't disagree with that, Your Honor. I agree with that, but I would suggest that in this case, the question is, well, did the district court clearly err in finding that this defendant didn't meet his burden of showing clear acceptance of responsibility? That is the standard clear error? I cited it in the case, and I believe that is the case, yes. I mean, I think it's the Ramos-Medina case, I believe. And that's the defense's burden in this case, right? Well, that's absolutely positively clear because that's just what the guidelines say. So, I mean, the defense... As I understand his explanation, it is essentially this. We would have, if we had known these facts at the appropriate time, we would have had the opportunity to enter into a guilty plea, to do the suppression hearing, enter into a conditional guilty plea and thereby get the acceptance of responsibility. But because the government didn't give us this information until right before the trial, we couldn't proceed in that fashion. I'm not sure exactly why. I don't know whether there was just no time to negotiate the plea or what. I mean, that's not quite filled out, but I gather that's the implication. And so we had to proceed the way we did, which was to have this kind of quick and dirty suppression hearing with no notice and then try to flesh out the facts some more during the trial in order as to the suppression issue, the Fourth Amendment issue. So we really weren't defending the case. We were just trying to get the Fourth Amendment issue decided in a way that we could appeal. Is that the reason? There's a lot in there, Your Honor. But I thought that's my understanding of what they're saying. A lot of that's correct. I mean, it is undoubtedly true that the suppression hearing happened very shortly before the trial. Now, whether that prohibited a stipulated facts trial or a guilty plea, that's something that the district court pointed to. But how much more did the district court need than to hear the testimony of the Border Patrol agent? I agree. I agree that he didn't need to hear more than that. I'm not sure that a trial was – I guess what I'm saying is I'm not sure that a trial was necessary to preserve any Fourth Amendment issue. And I certainly disagree. There's nothing in the Border Patrol agent's suppression testimony that's different from what he said on the witness stand in front of the jury. I agree with that. I guess they did put on somebody who went there one night and said there were lots of people around. Right. There was a – and I'm not going to pretend that there wasn't additional evidence. There was. There was an investigator who testified about a broader area a different night and said, well, there were a lot of people around. But that was – The state of the record is that on the night in question, there were no cars and the only other people in the vicinity, because all the shops were closed, were four other people, and they were being questioned by another Border Patrol agent. That's correct. After he put out the broadcast that somebody just climbed over the international fence by the water tower. That's correct. I don't see it. I don't see that a trial was necessary. I don't see – and what I especially don't see is a trial that's necessary that says they got the wrong guy, returned a verdict, but not guilty. And the reason for the suspicion question, I gather that your first position is he didn't need reasonable suspicion. I'm sorry? Your first position is that he didn't need reasonable suspicion. Yes. Why? He did try to walk away with certain suggestions. That, I'm glad Your Honor brought that up, because I very much disagree with counsel about what the record says on that. As I read the record, it's both at the suppression hearing and at trial, this is what the Border Patrol agent testified. I parked. I got out. I saw somebody walking. I parked. I got out, and I approached him. I introduced myself as a Border Patrol agent, and I started to ask him questions. That was the testimony. That's at 3 ER 5 and 3 ER 13. That's the suppression hearing testimony. And then the trial testimony is I parked, I got out, I approached. That's at 2 ER 18. I introduced myself as a Border Patrol agent, and I asked him, what citizen are you a country of? So I very much disagree that there was a time trying to get away. I didn't see any testimony. I read the transcript. I didn't see any testimony that he tried to walk away. So I'm in heated agreement with Your Honor on that. I appreciate Mr. Hermanson's vigorous advocacy, but there are no facts to support that out. So I think it was a perfectly legitimate thing for the officer to do on a public street at 120 in the morning in downtown Calexico right across the border fence. And Mr. Ortiz could have said, I don't want to answer your questions, and then the Border Patrol agent said, well, you're going to stay here and answer them, and then we'd have a stop, but that's not what we have. Which is really implicitly what happened. I mean, I find these cases cynical, frankly, because there is no chance that if he had said, okay, I'm leaving, I think I would have said fine. You know, Your Honor, I actually – there are individuals who go up to the border people and film them and say, are you telling me I can't go away now? So that's not what I would do. It's probably not what Your Honor would do. But people do it. No, but I'm saying he had for sure, the Border Patrol would have said, or officer. I agree. He would have said, no, you're going to stay. You're not going anywhere. And he would have had good reason to. Particularly after he says he twice can't say where he was born, and then he comes up with L.A., but he has no identification. Right. Yes, but the question is what if he just said, I'm leaving, goodbye. Right. So, therefore, I'm more comfortable with the reasonable suspicion approach. So then the question with regard to the reasonable suspicion is, it can't be true that somebody wearing black clothes walking near a border at night is enough suspicion to stop. Just that. It has to have something to do with the fact that they saw somebody coming over the wall and that they thought they were going to where he was coming. I agree. Right, so you're not saying that just the fact that he was – Completely. Walking very near the fence in black clothes at 120 at night was – No, that wouldn't be enough. But black clothes where he's just seen somebody who's hopped over with black clothing. There's absolutely nobody else who's not accounted for around, nothing open. And your experience is this is where they head. They go there and that's where he is. That's certainly enough to stop him and start asking him some questions if there was a stop. In terms of these other four people, we don't know anything about them, but even if all four of them were wearing black clothing, you could have, I suppose, reasonable suspicion to stop five different people who are in the vicinity, the exact vicinity. Right. And I think it's the case that the reasonableness of suspicion will vary according to the information you have at the time. You see the person at the place you think he's going to be. Let's say you stop him. I don't agree that you stop him, but you say stop him. You ask him some questions, and then you get this completely no identification documents at all, which is a little unusual in the first place. In the second, I can't remember where they were born. The reasonable suspicion has certainly ratcheted up quite a bit. Didn't the officer also testify he had personally made 40 to 50 arrests in the same vicinity? Yes. And that's not surprising. I mean, I think if Your Honor's been there, it's a wall right in the middle of the city. Between two cities. You've got Mexicali on one side, which is a huge city, and you've got Calexico on our side. Right. So unless the Court has further questions, I submit. Thank you. Thank you very much. I'll give you a minute. Or whatever it is. Minute 20, I guess. I just wanted to respond that this really was a pro forma trial. It was a very, very short trial. And the fact that I said in opening and closing, you know, please find Mr. Ortiz not guilty, doesn't do anything more than put the government to their burden. It would be a totally different case if I had said there was they didn't prove that he had the conscious desire to be in the United States. I didn't say that. It would be a totally different case if I had argued that. Isn't that what putting the government to their burden means? It means you're saying that they didn't prove beyond a reasonable doubt the elements of the crime. I don't want to say, I mean, what else could you be saying? Right. But I think it would be more, I didn't want to jeopardize acceptance of responsibility, so I purposefully did not argue they got the wrong guy, this isn't the guy on the fence. Therefore, you shouldn't find. Wait a second. I thought I heard your opponent say that you argued in opening and closing you got the wrong guy. Correct. And you shouldn't connect them. I mean, it looks to me like what you did, and I would have done the same thing. Let's take a flyer on this one and see if maybe we can get an acquittal from the jury on the attempted entry charge, because there is a question as to whether or not he was, in fact, the guy. But that didn't pan out. That's not what we did, and I never really had any hope in this case that there would be a not guilty, because he was found 30 yards north of the border. That's right, but you claimed you had a stipulated facts trial. The stipulated facts trial, the parties agreed that that would not be the most efficient way to both supplement the record for the Fourth Amendment issue, because it was more convenient to have the board appellate agent come back for a trial, which was already scheduled, than to have another evidence you're hearing, or for me to go to the jail and try to get my client to waive everything and explain it to him. But it was already scheduled, presumably, because he wasn't accepting responsibility. I mean, there was a trial scheduled even before the Fourth Amendment issue came up. I mean, the U.S. attorney who tried this case and I agreed that the most efficient way to deal with this was to just go forward with the trial. It would create fewer appellate issues, because there would have been issues regarding whether he, knowing involuntarily and intelligently, was able to waive his right to go to trial. Also, you could have argued all this to the jury, to the judge, as part of sentencing, right? In other words, even if he didn't meet the official two points, you could have said, well, this is what we were doing, and he shouldn't be penalized, and he should have still got the two points. As the transcript shows, it was a heavy calendar, as the judge said. He really didn't give us very much time to argue. But, I mean, the bottom line thing is, you need a substantial step and conscious desire. I never argued that those weren't in existence. I never argued that the government didn't prove that. So I didn't say that to the jury, and, therefore, he should get acceptance of responsibility. Okay. Thank you very much. Thank both of you for your arguments in the United States v. Ortiz, and we are going to take a short recess. Thank you.
judges: Berzon, Tallman, Smith